UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

JAMES CASEY,

                    Plaintiff

            -against-

WILLIAM GRANT AND SONS, INC., GRANT
MCKENZIE, and GLENN GORDON

               Défendants.

-------------------------------------------------------------------x

Docket No:  1:26-cv-3700

COMPLAINT

JURY TRIAL DEMANDED

Plaintiff James Casey ("Plaintiff" or "Casey"), by and through his attorneys Sacco & Fillas, LLP, as and for his complaint against Defendants William Grant and Sons ("WG&S"), Grant McKenzie ("McKenzie"), and Glenn Gordon ("Gordon"), collectively referred to herein as ("Defendants"), states and alleges as follows:

## **NATURE OF THE ACTION**

1.     WG&S hired Plaintiff in April of 2025 as its President and Managing Director for United States operations. On September 17, 2025, Mr. Casey sustained injuries in an Uber incident while returning from WG&S Hudson Distillery, after his vehicle was rear-ended by another automobile traveling in excess of the speed limit on the Taconic Parkway in New York.

2.     As a result of the accident, Mr. Casey sustained ligament damage in the neck as well as an injury to his lower back, which made it difficult for him to travel for a period, as travel appeared to exacerbate his back condition. After Plaintiff informed WG&S that he would need an accommodation related to his ability to travel due to his back injury, they terminated his employment on December 3, 2025, without cause and without engaging in the interactive process to determine whether an accommodation would allow him to continue working.

1

**JURISDICTION AND VENUE**

3. The Court has jurisdiction over this action under 28 U.S.C. § 1332 on diversity grounds.

4. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because the Corporate Defendants maintain their principal place of business in the County of New York, and this district is where a substantial part of the events or omissions giving rise to the claim occurred.

**PARTIES**

5. Plaintiff is an individual residing in Fairfield County in the State of Connecticut.

6. At all relevant times hereinafter, Plaintiff suffered from ligament damage in his neck as well as an injury to his lower back after being in a car accident on September 17, 2025.

7. Casey's ligament damage and injury to his lower back qualify as a disability under both the NYSHRL and NYCHRL

8. At all relevant times hereinafter, WG&S was and is a licensed foreign corporation with its principal place of business in the county of New York.

9. At all relevant times herein, WG&S was Plaintiff's employer within the meaning of the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

10. At all relevant times hereinafter, WG&S was and is a foreign corporation with its principal place of business in the county of New York.

11. At all relevant times hereinafter, Gordon is the owner of WG&S.

12. Upon information and belief, Gordon is a resident of the Bailiwick of Jersey, an autonomous, self-governing British Crown Dependency located in the English Channel near France.

13. At all relevant times herein, Gordon was Plaintiff's employer within the meaning of the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

14. At all relevant times herein, Gordon has the power to, inter alia, hire and fire employees, establish and pay their wages, set their work schedules, determine their job duties and responsibilities, maintain their employment records, and/or otherwise have the authority to alter the terms and conditions of the employees' employment, including Plaintiff.

15. Upon information and belief, McKenzie is an individual residing in London, England, in the United Kingdom.

16. At all relevant times hereinafter, McKenzie is the CCO of WG&S and Plaintiff's direct supervisor beginning on or about December 2025.

17. At all relevant times herein, McKenzie has the power to, inter alia, hire and fire employees, establish and pay their wages, set their work schedules, determine their job duties and responsibilities, maintain their employment records, and/or otherwise have the authority to alter the terms and conditions of the employees' employment, including Plaintiff.

18. At all relevant times herein, McKenzie was Plaintiff's employer within the meaning of the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

**STATEMENT OF FACTS**

19.     WG&S hired Mr. Casey as its President and Managing Director for United States operations, effective April 1, 2025.

20.     As part of his employment, Mr. Casey signed an offer letter outlining the specific terms and conditions of his employment with WG&S.

21.     The offer stipulated that WG&S was required to provide Mr. Casey with a minimum of six months' advance notice of termination or to compensate him instead of such notice, except in cases where the termination was based on WG&S's "Good Faith" judgment that Mr. Casey had engaged in misconduct.

22.     In accordance with the terms of his offer, Mr. Casey commenced employment with WG&S on April 1, 2025.

**Plaintiff's Discrimination Claims**

23.     On September 17, 2025, Casey sustained injuries in an Uber incident while returning from WG&S Hudson Distillery, after his vehicle was rear-ended by another automobile traveling in excess of the speed limit on the Taconic Parkway in New York.

24.     On September 18, 2025, Casey reported the incident to his immediate supervisor, Soren Hagh, who served as the Global CEO for WG&S until December of 2025.

25.     After the accident. Casey began experiencing neck and back pain so severe that he was compelled to consult his physician on September 19, 2025.

26.     During this consultation, an MRI was conducted, the findings indicated that the plaintiff sustained ligament damage in the neck as well as an injury to his lower back.

27.     Casey was prescribed a steroid regimen and a skeletal relaxant, which he continues to be prescribed to the present day.

28. Following his injury, Mr. Casey participated in the partner conference in Scotland from October 6th to October 9th with Mr. Glenn Gordon, Chairman and Owner of WG&S, and Mr. Soren Hagh, former CEO.

29. During this period, Mr. Casey experienced significant back pain, which necessitated standing during multiple presentations.

30. Mr. Casey was compelled to cancel the scheduled golf outing with customers who had traveled to Scotland and depart early from a walking tour due to discomfort.

31. After having canceled the golf outing, Gordon alleged that Plaintiff intentionally left the customers because he did not want to host them golfing, and that Plaintiff created a distraction by standing during the presentation.

32. While in Scotland, Casey also disclosed his injury to Graeme Jenkins (Interim Co-CEO, CFO) and Doug Bagley (Interim Co-CEO, CCO).

33. On October 28, 2025, Gordon confirmed via email that he was aware of Plaintiff's injury.

34. In meetings with Gordon on October 31, 2025, Plaintiff repeatedly had to stand due to discomfort from his injuries. Plaintiff and Gordon discussed his doctor's appointment and how he was doing.

35. Plaintiff left the meeting, believing that Gordon did not comprehend that Plaintiff would need to accommodate his injuries and may need to adjust his travel.

36. Gordon sent one more Teams message to Plaintiff a few days later, but thereafter ghosted Plaintiff by failing to respond to any of his emails.

37. It was clear to Plaintiff that their relationship had changed once Gordon saw the extent of Plaintiff's injury, and that Plaintiff would require some accommodation relating to his travel.

38. Thereafter, WG&S required Mr. Casey to attend a corporate meeting in Switzerland from November 18th to 21st, 2025.

39. Once again at the corporate meeting, Mr. Casey experienced the same back issue.

40. The facilitator, a non-WG&S employee, permitted Mr. Casey to sit at the end of a row at the back of the room so he could stand without disrupting the proceedings.

41. On November 20th, Mr. Casey was in such severe pain that he was compelled to leave the meetings early and return to the hotel.

42. Plaintiff returned at 6 pm for a meeting with Will Payne ("Payne"), interim global General Council, Steve Napier ("Napier") (HR), and Ken (Executive Board member), where Plaintiff discussed his travel challenges and the significant pain it caused him.

43. Later that evening, Ms. Roxana Corha, the Chief Human Resources Officer, joined Mr. Casey for a drink in the hotel lobby bar.

44. During this time, Mr. Casey conveyed to Ms. Corha that the flight had been very taxing for him and that he might be unable to travel for a period, as the travel appeared to be exacerbating his back condition.

45. Plaintiff had a separate meeting with Mr. Payne on October 21 they talked at length about Plaintiff's accident issues and the need to figure out how to manage the pain and travel.

46. On November 26, 2025, Mr. Casey sent an email to Ms. Teresa O'Meara, the EH&S Manager, and Ms. Traci Lashley, informing them that he had commenced physical therapy for injuries associated with the incident.

47. On the morning of December 2, 2025, incoming Chief Executive Officer Grant McKenzie met with Mr. Casey. During the meeting, Mr. Casey detailed his medical condition and the accommodations necessary following his accident three months prior.

48. Mr. Casey attended his initial physical therapy session on December 3, 2025, which resulted in his arriving late at work.

49. After arriving late due to his physical therapy session, Mr. Casey was informed that WG&S would terminate his employment without cause, effective December 5, 2025.

50. As per the employment contract entered into between Casey and WG&S, WG&S agreed to provide Casey with a lump sum payment reflecting a severance of six months' salary.

51. The offer of severance from WG&S is an admission that WG&S had no "Good Faith" basis to believe Casey had engaged in misconduct before his termination.

52. Had the Defendants had a "Good Faith" basis to believe Casey had engaged in misconduct, they would not have been obligated to provide Casey with a severance offer equating to six months' salary.

53. After WG&S terminated his employment, Casey sent an email to the employees of WG&S, criticizing WG&S.

54. Casey's remarks were communicated privately to WG&S employees and were not disclosed to any third party or in a public forum.

55. While Casey's comments may have been uncomfortable for WG&S to read, they did not constitute misconduct under the employment contract Casey and WG&S entered into.

7

56. After Casey sent his farewell email, WG&S rescinded the six-month severance agreement they had previously agreed to provide Casey, breaching their employment contract.

57. WG&S explicitly violated its employment agreement with Mr. Casey by rescinding his severance package after he issued a farewell message to his colleagues.

58. Casey's email message was sent after WG&S had already decided to terminate Plaintiff's employment, and does not rise to the level of misconduct to justify Defendant's rescission of the offer of severance.

59. Casey's email played no part in the Defendants' decision to terminate his employment, as the Defendants' decision to terminate Casey's employment was made independently and before his farewell email to his colleagues.

**Plaintiff's Whistleblower Claims**

60. Additionally, Defendants retaliated against Plaintiff as a result of his Whistleblower complaints.

61. During his employment, Plaintiff was made aware that a brand of Whiskey imported by the Defendants was improperly labeled and violated U.S. labeling laws.

62. 27 CFR § 5.74 requires that "For all domestic or foreign whiskies that are aged less than 4 years, including blends containing a whisky that is aged less than 4 years, an age statement and percentage of types of whisky statement is required to appear on a label, unless the whisky is labeled as "bottled in bond" in conformity with § 5.88."

63. The whiskey imported by Defendants and sold in the United States under the name Clan MacGregor was only aged for three years and had not been labeled correctly by WG&S pursuant to the 27 CFR § 5.74, meaning Defendants violated 27 CFR § 5.74 by selling improperly labeled whiskey.

64. As President and managing director at WG&S, Plaintiff was informed that the company did not want to risk telling the authorities of the mislabeling, for fear it would expose WG&S to potential fines and consumer lawsuits.

65. WG&S informed Plaintiff that they planned to change the liquid inside Clan MacGregor to a four-year whiskey moving forward to bring it into compliance, and then at some point in the future, change to the correct 3-year label and liquid to avoid anyone looking into the history.

66. WG&S specifically made this decision with the hopes it would discourage someone from looking into the history of Clan MacGregor.

67. Plaintiff objected and informed Shona, head of WG&S United States legal division, that WG&S would be intentionally deceiving regulatory agencies if discovered and would have a huge reputational impact on WG&S.

68. Defendants dismissed plaintiff's concerns as low risk but made it clear to Plaintiff that WG&S did not agree with or appreciate Plaintiff's position on the issue.

69. Additionally, Plaintiff became aware of an issue involving WG&S's former Chief Marketing Officer ("CMO").

70. In October of 2025, WG&S's head of procurement raised a major compliance issue where the CMO had circumvented the new vendor process, pressuring the head of procurement to approve, and then proceeded to award a new vendor with a $500K project.

71. Upon information and belief, the CMO had a personal relationship with the vendor, and an award of this nature is a specific and material compliance breach.

72. Plaintiff brought the issue to Shona's attention on Oct 22nd on a drive to the airport. Shona was aware of the violation and seemed to downplay its gravity, suggesting it was an urgent business need.

73. Plaintiff addressed the issue with Gordon and the CMO at an October 31, 2025, meeting.

74. Shortly thereafter, the CMO filed an internal complaint against Plaintiff.

75. At a November 20, 2025, meeting with Payne, Napier, and Ken (Executive Board member), Plaintiff made it clear that he believed this conduct created risk for him, making him liable and accountable for the US business.

76. Upon information and belief, had Plaintiff not reported the illegality, he would have been liable to WG&S for breach of his Duty of Loyalty, Duty of Good Faith, and a breach of his fiduciary duty.

**AS AND FOR A FIRST CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
**(Discrimination Based on Disability; Executive Law § 296(1)(a))**

77. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

78. Executive Law § 296(1)(a) provides that "It shall be an unlawful discriminatory practice for an employer … because of an individual's … disability … to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

79. WG&S discriminated against Plaintiff because of his disability in violation of Executive Law § 296(1)(a) by terminating his employment after he explained that he would need

10

to accommodate his travel schedule due to the neck and back injuries he sustained as a result of his September 2025 injury from a car accident.

80. At no time did WG&S engage in a cooperative dialogue and/or interactive process with Plaintiff to ascertain if Plaintiff's requested accommodation was reasonable before terminating Plaintiff's employment.

81. WG&S has a duty to engage in a cooperative dialogue and/or interactive process with a disabled worker to ascertain whether any reasonable accommodation would allow a disabled worker to work with an accommodation.

82. WG&S did not engage in an interactive process with Plaintiff to determine if any reasonable accommodation could enable Plaintiff to work with an accommodation.

83. Based on the foregoing actions, Defendants discriminated against Plaintiff because of his disability in violation of Executive Law § 296(1)(a).

84. As a direct and proximate result of Defendants' discrimination in violation of Executive Law § 296(1)(a), Plaintiff suffered, and continues to suffer, monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

85. As a direct and proximate result of Defendants discrimination in violation of Executive Law § 296(1)(a), Plaintiff is entitled to damages including, but not limited to, past and future lost wages and benefits, damages to compensate him for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**AS AND FOR A SECOND CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
**<u>(Discrimination Based on Disability; N.Y.C. Admin. Code § 8-107 (1)(a))</u>**

86.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

87.     N.Y.C. Admin. Code § 8-107 (1)(a) provides that "It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the actual or perceived… disability… To discriminate against such a person in compensation or in terms, conditions, or privileges of employment."

88.     At no time did WG&S engage in a cooperative dialogue and/or interactive process with Plaintiff to ascertain if Plaintiff's requested accommodation was reasonable before terminating Plaintiff's employment.

89.     WG&S has a duty to engage in a cooperative dialogue and/or interactive process with disabled workers to ascertain whether any reasonable accommodation would allow a disabled worker to work with an accommodation.

90.     WG&S did not engage in an interactive process with Plaintiff to determine if any reasonable accommodation could enable Plaintiff to work.

91.     Based on the foregoing actions, Defendants discriminated against Plaintiff because of his disability in violation of N.Y.C. Admin. Code § 8-107 (1)(a).

92.     As a direct and proximate result of Defendants' discrimination in violation of N.Y.C. Admin. Code § 8-107 (1)(a), Plaintiff suffered, and continues to suffer, monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

93.     As a direct and proximate result of Defendants' discrimination in violation of N.Y.C. Admin. Code § 8-107 (1)(a), Plaintiff is entitled to damages, including, but not limited to, past and future lost wages and benefits, damages to compensate him for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees, and costs of this action, and pre-judgment interest.

**AS AND FOR A THIRD CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
**(Retaliation Based on Disability; N.Y.C. Admin. Code § 8-107 (7))**

94.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

95.     N.Y.C. Admin. Code § 8-107(7) provides that "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has … (v) requested a reasonable accommodation under this chapter."

96.     At no time did WG&S engage in a cooperative dialogue and/or interactive process with Plaintiff to ascertain if Plaintiff's requested accommodation was reasonable before terminating Plaintiff's employment.

97.     WG&S has a duty to engage in a cooperative dialogue and/or interactive process with disabled workers to ascertain whether any reasonable accommodation would allow a disabled worker to work with an accommodation.

98.     WG&S did not engage in an interactive process with Plaintiff to determine if any reasonable accommodation could enable Plaintiff to work.

99.     Based on the foregoing actions, Defendants discriminated against Plaintiff because of his disability in violation of N.Y.C. Admin. Code § 8-107 (7).

100. As a direct and proximate result of Defendants' discrimination in violation of N.Y.C. Admin. Code § 8-107 (7), Plaintiff suffered, and continues to suffer, monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

101. As a direct and proximate result of Defendants' discrimination in violation of N.Y.C. Admin. Code § 8-107 (7), Plaintiff is entitled to damages, including, but not limited to, past and future lost wages and benefits, damages to compensate him for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees, and costs of this action, and pre-judgment interest.

**AS AND FOR A FOURTH CAUSE OF ACTION
AS AGAINST WG&S
(Breach of Contract)**

102. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length

103. On or about March 2025, WG&S and Casey entered into an employment agreement (the "agreement").

104. The agreement stipulated that WG&S was required to provide Mr. Casey with a minimum of six months' advance notice of termination or to compensate him instead of such notice, except in cases where the termination was based on WG&S's "Good Faith" judgment that Mr. Casey had engaged in misconduct.

105. The term "Misconduct" was not explicitly defined within Mr. Casey's offer letter, the supplemental Employee Confidentiality and Protective Covenant Agreement, or the WG&S Employee Handbook.

14

106. In accordance with the terms of his offer, Mr. Casey commenced employment with WG&S on April 1, 2025.

107. On December 3, 2025, WG&S informed Casey that, effective December 5, 2025, they would terminate his employment without providing him with the six months' notice required by the employment agreement and agreed to provide him with six months' pay as severance pursuant to the agreement.

108. On December 3, 2025, at approximately 4:52 pm, Casey sent an email to his team informing them of his termination, which was also critical of the policies of WG&S.

109. After Casey sent the email, WG&S revoked the six months' severance pay they had agreed to pay him.

110. WG&S breached the employment agreement by terminating Plaintiff's employment without providing him with a minimum of six months' advance notice of termination or compensating him instead of such notice.

111. Based on the foregoing actions, Defendants breached their employment contract with Plaintiff.

112. As a direct and proximate result of Defendants' breach of the employment agreement, Plaintiff suffered, and continues to suffer, monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

113. As a direct and proximate result of Defendants' breach of the employment agreement, Plaintiff is entitled to damages, including, but not limited to, General, Consequential past and future lost wages and benefits, damages to compensate him for past and future physical and emotional distress, punitive damages, and costs of this action, and pre-judgment interest.

**AS AND FOR A FIFTH CAUSE OF ACTION
AS AGAINST ALL DEFENDANTS
(Volitions of New York Labor Law § 740(2)(a))**

114. Plaintiff hereby repeats, realleges, and reiterates all the allegations stated above as if fully set forth herein.

115. N.Y. Labor Law § 740(2)(a), New York State's Whistleblower Statute, explicitly bars employers from "tak[ing] any retaliatory action against an employee ... because such employee ... discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation."

116. Plaintiff's belief that Defendants' failure to label Clan MacGregor properly was illegal was and is reasonable and is protected by N.Y. Labor Law § 740.

117. Plaintiff disclosed to the head of WG&S United States legal division that improperly labeling Clan MacGregor was illegal and violated United States Law.

118. Defendants terminated Plaintiff's employment after he complained of their illegal labeling practices.

119. But for Plaintiff's complaints about the proper relabeling of Clan MacGregor, Defendants would not have terminated his employment.

120. Additionally, Defendants retaliated against Plaintiff for his complaints about the CMO's malfeasance in violation of N.Y. Labor Law § 740(2)(a).

121. The CMO's actions violated her duty of loyalty and fair dealing and constituted a breach of her fiduciary duty to WG&S.

122. Plaintiff reported this breach to WG&S and reasonably believed that the CMO's violation amounted to a breach of her fiduciary duty and her duty of loyalty to WG&S, which Plaintiff reported to his supervisor.

123. Plaintiff's reporting of the CMO's breach of fiduciary duty and duty of loyalty is a law, rule, or regulation protected by N.Y. Labor Law § 740(2)(a).

124. But for Plaintiff's complaints about the CMO, Defendants would not have terminated his employment.

125. Plaintiff suffered and continues to suffer monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

126. Plaintiff also suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress, and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

127. As a direct and proximate result of Terri Medi and Third-Party Defendants' unlawful actions in violation of N.Y. Labor Law § 740(2)(a), Third-Party Plaintiff is entitled to punitive damages plus attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendant:

A. Awarding Plaintiff damages for all monetary losses, including, but not limited to, back pay, front pay, lost compensation, lost benefits, and reduced pension;

B. Awarding Plaintiff damages in an amount to be determined at trial plus interest to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for his severe mental anguish and emotional distress, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering, and other physical and mental injuries;

C. Awarding Plaintiff punitive damages in an amount to be determined at trial;

D. Awarding Plaintiff costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorney's fees to the fullest extent permitted by law; and

E. Declaring that Defendants engaged in unlawful employment practices prohibited by the laws of the State of New York.

Dated: Astoria, New York
May 5, 2026

SACCO & FILLAS, LLP

*Scott William Clark*

Scott William Clark Esq.
*Attorney for Plaintiff*
3119 Newtown Ave, Seventh Floor
Astoria, New York 11102
Tel: 718- 269-1627
sclark@SaccoFillas.com