UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

JAMES CASEY,

                        Plaintiff

        -against-

WILLIAM GRANT AND SONS, INC., GRANT
MCKENZIE, and GLENN GORDON

                        Défendant

---------------------------------------------------------------------x

Docket No:  1:26-cv-3700

AFFIRMATION OF SCOTT
WILLIAM CLARK, ESQ.IN
SUPPORT OF PRELIMINARY
INJUNCTION AND
TEMPORARY RESTRAINING
ORDER

I, Scott William Clark, Esq. an attorney, admitted to practice before this court, hereby affirm under the penalties of perjury:

1.     I am an associate of the law firm Sacco Fillas LLP, attorneys for Plaintiff James Casey ("Plaintiff"). As such, I am fully familiar with the facts and circumstances related to this action.

2.     I submit this Affirmation in Support of the Plaintiff's application for a preliminary injunction and Temporary Restraining Order preventing Defendant William Grant & Sons ("WG&S") from enforcing the non-compete provision of the Employment Confidentiality and Protective Covenants Agreement entered between Plaintiff and Defendant William Grant & Sons.

3.     The non-compete provision threatens Plaintiff with the loss of his livelihood, his profession, and further causes the Plaintiff irreparable harm.

4.     Without the protection of a Temporary Restraining Order and preliminary injunction, Plaintiff will face immediate and irreparable harm.

5.      Plaintiff's counsel provided email notice to Phillip Berkowitz at pberkowitz@littler.com, WG&S's attorney, on May 5, 2026, of this instant motion to seek a TRO and preliminary injunction.

**Background and Relevant Facts**

6.      WG&S and Plaintiff entered into an employment agreement on March 7, 2025, whereby Plaintiff agreed to serve as their President & Managing Director, USA-based in their New York City office. A true and accurate copy of the offer letter, dated March 5, 2025, and signed by both parties on March 7, 2025, is attached hereto as Exhibit "A."

7.      In consideration for Plaintiff's service, WG&S agreed to pay him a salary of $500,000 and agreed not to terminate Plaintiff's employment without providing Plaintiff with six months' advance notice or to pay him in lieu of said notice unless his termination was due to the company's good faith judgment that he had engaged in misconduct.

8.      The term "Misconduct" was not explicitly defined within Mr. Casey's offer letter, the supplemental Employee Confidentiality and Protective Covenant Agreement, or the WG&S Employee Handbook.

9.      As part of Plaintiff's employment with WG&S, he also entered an Employment Confidentiality and Protective Covenants Agreement ("Confidentiality Agreement") with WG&S. A true and accurate copy of the Confidentiality Agreement, signed by both parties on March 7, 2025, is attached hereto as Exhibit "B." The Confidentiality Agreement also contained a protective Covenant**.** Which states as follows:

> **4. Protective Covenants.** I acknowledge that some activities by me would, by their nature and irrespective of my intent, involve conversion of Company trade secrets and other Business Investments to the unfair advantage of competitors if engaged in shortly after my employment ends. To avoid the irreparable harm

2

that would be caused by conduct of this nature, I agree to comply with the reasonable post-employment limitations on my conduct described in this Section below (collectively referred to as the "**Protective Covenants**").

10.     The Confidentiality Agreement also contained a non-compete provision:

**4.1 Noncompete**. For a period of twelve (12) months after my Termination Date, I will not provide services to or be associated with a Competitor in any role or position (as an employee, director, owner, consultant, or otherwise) that would involve Competitive Activity in or related to the Restricted Area. This paragraph is my "Noncompete" covenant.

11.     The Confidentiality Agreement defined "competitive activity" as:

"4.4 (b) activity on behalf of a Competitor that involves (i) providing, supervising, or managing services that are the same as or similar in function or purpose to those I provided, supervised, or managed for the Company in the Look Back Period,(ii) inducing, encouraging, or causing a Covered Provider to cease or reduce doing business with the Company or to move business opportunities away from the Company and to a Competitor, (iii) assisting in the creation, development, or improvement of a competing product or service, (iv) selling competing products or services to, or accepting competing business from, any persons or entities who are Covered Customers or that I should (through reasonable efforts) know to be customers of the Company, (v) owning or operating a Competitor, or (vi) undertaking any other duties or responsibilities that would be likely (whether intentional or not) to require or result in the use or disclosure of Confidential Information for the benefit of a Competitor."

12.      And thereafter defined "Restricted Area" as:

(i) the locations where the Covered Customers are present and available to do business with the Company or a Competitor, and (ii) the United States and each additional country where the Company does business that I had involvement with or was provided Confidential Information about in the Look back period; or, if my responsibilities and access to Confidential Information was limited to a smaller defined geographic area, then the geographic areas of responsibility assigned to me in the Look Back Period (using the state, county, zip code, or other geographic

3

boundary description ordinarily used in the course of the Company's business); or, if (ii) is not applicable or enforceable with respect to me then (iii) each state and county (and the contiguous counties and states thereto) where I resided or was assigned to work for the Company in the Look Back Period. Counties and states include their equivalents (such as, but not limited to, Districts, Commonwealths, and Parishes).

13.   On September 17, 2025, Plaintiff was injured in an Uber incident while returning from WG&S Hudson Distillery, after his vehicle was rear-ended by another automobile traveling in excess of the speed limit on the Taconic Parkway in New York.

14.   After the accident. Plaintiff began experiencing neck and back pain so severely that he was forced to visit his doctor on September 19, 2025, who diagnosed Plaintiff with ligament damage in his neck as well as an injury to his lower back and prescribed Plaintiff a steroid regimen and a skeletal relaxant, which he continues to be prescribed to the present day.

15.   For the next several months, Plaintiff's back problems persisted, making it difficult for him to travel without experiencing pain. Plaintiff kept WG&S, its HR department, and its board of directors, including its owner, Defendant Glenn Gordon, informed at all times of his injury and his need for accommodation.

16.   On the morning of December 2, 2025, Plaintiff met with incoming Chief Commercial Officer Grant McKenzie and detailed his medical condition and the accommodation necessary following his accident three months prior, including his need for physical therapy.

17.   After Plaintiff arrived at work late on December 3, 2025, after his physical therapy session, he was informed that WG&S would terminate his employment without cause, effective December 5, 2025.

18.    In addition, prior to his termination, Plaintiff alleges he made two whistle-blower complaints. The first was after Plaintiff learned that WG&S was mislabeling its whiskey, selling whiskey aged for only three years as whiskey aged for four years in violation of 27 CFR § 5.74.

19.    And the second, after Plaintiff learned in October of 2025 of an issue where the ex-CMO had circumvented the new vendor process, pressuring the head of procurement to approve, and then award a new vendor with a $500K project, a vendor Plaintiff reasonably believed the ex-CMO had a personal relationship with.

20.    As such, Plaintiffs' complaint alleges that Defendants terminated his employment because of his disability and his need to accommodate Plaintiff's travel, and in retaliation for his whistleblower complaints.

21.    Plaintiff also alleged that Defendants breached the employment contract when they terminated his employment without cause. WG&S initially offered Plaintiff a severance payment of $250,000 pursuant to the employment agreement.

22.    After Plaintiff sent a farewell email to WG&S employees critical of WG&S, its management, and the ex-CMO, who Plaintiff reasonably believed had violated the vendor process, WG&S rescinded Plaintiff's severance payment.   A true and accurate copy of the email is attached hereto as Exhibit "C."

23.    Shortly thereafter, Plaintiff was able to secure employment with a small start-up spirits company, which Plaintiff reasonably believes is not a competitor to WG&S.

24.    Since this Company is not a competitor to WG&S, Plaintiff's employment with them does not violate the provisions of the protective covenant.

25.    The Confidentiality Agreement defines a competitor as "a person or entity who is engaged in (or is planning or preparing to engage in) a distilled premium spirits business in the

5

same spirits category as the Company (existing or demonstrably under development during the Look Back Period) so long as the Company remains in the business of providing such products or services."

26.     Plaintiff currently works for a start-up company in Tennessee that makes American Bourbon Whiskey, whose total revenue last year was $600,000.

27.     WG&S does more than one billion in global sales, of which only less than 0.005% comes from the American Whiskey spirits category, and they do not produce an American Whiskey in Tennessee.

28.     The only American Whiskey product WG&S sells, Hudson, was produced in New York, and they have stopped distilling and laid off the entire production staff.  Product sales have been in sharp decline for many years and are not a focus for WG&S. This product is irrelevant to the WG&S business.

29.     Plaintiff had twenty-seven years of industry experience before WG&S, nor did he learn any trade secrets at WG&S regarding distribution.

30.     As President of the WG&S US-owned distribution company (ODC), Plaintiff did not have responsibility for or visibility into production, cost of goods, global strategy, or many of the other confidential information areas that a company would want to protect.

31.     There is nothing in the American Whiskey category that could cause WG&S irreparable harm.

32.     Plaintiff's new employer is not a competitor of WG&S, as WG&S does not offer a distilled premium spirits business in the same spirits category as Plaintiff's new employer. (Tennessee Whiskey).

**<u>Immediate, Irreparable Harm</u>**

6

33.     In early settlement talks, WG&S made it clear that they would seek to enforce the non-compete clause of the employment contract.

34.     The noncompete clause should be declared unenforceable.

35.     WG&S's threat to enforce the noncompete clause puts Plaintiff at risk of immediate, irreparable injury—the loss of livelihood, profession, and career.

36.     WG&S would suffer no harm from the preservation of the status quo and would be in no worse position than it stands today. On the other hand, if WG&S is allowed to enforce the noncompete clause, Plaintiff's profession, livelihood, and career, which he has cultivated over more than thirty years, will be threatened. For those reasons, Plaintiff has no adequate remedy at law.

**<u>Plaintiff is Likely to Succeed on the Merits</u>**

37.     New York courts "will not enforce a non-competition provision in an employment agreement where the former employee was involuntarily terminated." See *SIFCO Indus., Inc. v. Advanced Plating Techs., Inc.*, 867 F. Supp. 155, 158 (S.D.N.Y. 1994).

38.     "An essential aspect [of enforceable restraints on employee mobility] is the employer's continued willingness to employ the party covenanting not to compete." SIFCO, 867 F. Supp. at 158 (alterations in original) (quoting Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 48 N.Y.2d 84, 421 N.Y.S.2d 847, 397 N.E.2d 358, 360 (1979)).

39.     "Enforcing a noncompetition provision when the employee has been discharged without cause would be 'unconscionable' because it would destroy the mutuality of obligation on which a covenant not to compete is based." *See Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010).

40.     On December 3, 2025, Defendants informed Plaintiff that they no longer had the willingness to continue to employ him, when they informed Plaintiff that his employment with WG&S would end on December 5, 2025.

41.     WG&S's offer of severance to Plaintiff is an admission that they had no cause to terminate Plaintiff's employment; had Defendants had cause to terminate Plaintiff's employment, they would have been under no obligation to offer Plaintiff a severance payment.

42.     On December 3, 2025, Plaintiff sent a farewell email critical of WG&S and its ex-CMO. Thereafter, WG&S rescinded the $250,000 severance payment to Plaintiff.

43.     WG&S terminated Plaintiff's employment without cause on December 5, 2025.

44.     Plaintiff's farewell email played no part in WG&S's continued willingness to employ Plaintiff, as WG&S made it clear they planned to terminate Plaintiff without cause prior to his farewell email.

45.     WG&S explicitly violated its employment agreement with Mr. Casey by rescinding his severance package after he issued a farewell message to his colleagues. The farewell message authored by Mr. Casey did not constitute misconduct under the employee confidentiality and non-disclosure clauses. His remarks were communicated privately to WG&S employees and were not disclosed to any third party or in a public forum.

46.

**<u>Conclusion</u>**

47.     No prior request has been made for the relief sought in this application

Dated: May 5, 2026                                      SACCO & FILLAS, LLP
        Astoria, New York

                                                        *Scott William Clark*
                                                        _____
                                                        Scott William Clark Esq.

3119 Newtown Ave
Astoria, New York 11102
Tel: 718- 269-1627
sclark@SaccoFillas.com